*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* MCCLOUD, Minors.

UNPUBLISHED
January 23, 2020

No. 348680
Muskegon Circuit Court
Family Division
LC No. 2013-043227-NA

Before: MARKEY, P.J., and GLEICHER and M. J. KELLY, JJ.

PER CURIAM.

Respondent-mother appeals by right the order terminating her parental rights to her three minor children under MCL 712A.19b(3)(c)(*i*) (conditions leading to adjudication continue to exist) and (j) (reasonable likelihood of harm to child if returned to parent).[1] We affirm.

## I. PERTINENT FACTS

The two oldest children were removed from respondent's care in 2016 after the 13-month-old boy suffered severe burns to his face, neck, and chest area and was found to have three unexplained healed fractures. The two-year-old girl was also found to have a healed fracture. At the adjudication, evidence was presented that the young boy's burns occurred when respondent was at work and while McCloud was bathing the child. The burns were consistent with the boy being dunked in hot water. Respondent did not believe that McCloud had abused the child. Additional evidence showed that in 2013, McCloud had burned another one of respondent's children while respondent was sleeping.[2] In that case, the burns appeared to have been caused by an electric stove. In her testimony about the 2013 case, respondent testified that

---

[1] The father of the three children at issue, K. McCloud, voluntarily relinquished his parental rights to the children. He is not a party to this appeal.

[2] This was a child that respondent had with a different father from an earlier relationship. That child is not encompassed by this appeal.

-1-

she did not know if McCloud had committed child abuse despite being aware that pediatric physical abuse had been confirmed and that McCloud had entered a plea in a criminal prosecution regarding the abuse. He pleaded guilty to second-degree felony child abuse and was still on probation when the 13-month-old boy was burned in 2016. Respondent stated that after the 2013 child protective proceeding was dismissed, she allowed McCloud to have unsupervised contact with the children. In addition to the 2013 conviction, McCloud was eventually convicted of second-degree child abuse for burning the 13-month old in 2016. The trial court assumed jurisdiction over the children after the jury found that respondent had neglected or refused to provide necessary care for the children's health, that there was a substantial risk to the children's well-being, and that there existed an unfit home environment.

Respondent's issues were identified as mental health and parenting skills. During the first year of this child protective proceeding, respondent maintained housing and employment, started counseling, and gave birth to the youngest child involved in this proceeding. The trial court assumed jurisdiction over the youngest child after respondent admitted having phone contact with McCloud while he was incarcerated and despite his convictions of child abuse against her children. Domestic violence counseling was added to the treatment plan because a review of the phone calls recorded at the jail and prison indicated that McCloud was very controlling and manipulative of respondent. The youngest child was placed in the home of respondent's grandmother and her husband, but concerns quickly surfaced about the hostile and demanding behavior the grandmother's husband exhibited, and the parties stipulated to an order that he not be allowed to attend parenting time.

At the beginning of the second year of the child protective proceeding, all three children moved into the foster care home of their paternal uncle and aunt. Respondent was starting to make progress in identifying unhealthy relationships, such as the one with her grandmother's husband. Concerns grew, however, about respondent's lack of transparency regarding individuals in her home. In addition, prison phone logs showed continued contact between respondent and McCloud, even though she had agreed not to have contact with him. Respondent had also allowed phone communication between the children and McCloud. Toward the end of the second year, respondent was evicted from her home for nonpayment of bills and moved into a domestic violence shelter. She later moved into her grandmother's home. Respondent subsequently secured an apartment but was again evicted. At one point, a man was discovered sleeping in respondent's residence during a scheduled home visit, and the man and respondent refused to provide the man's identity. Respondent later told a caseworker that she only knew the man by his street name, Doggy. On another occasion, the caseworker, during a scheduled parenting time visit at respondent's home, discovered belongings in the basement that appeared to be those of a male. Respondent stated that she was storing the belongings for a cousin, but, according to the caseworker, respondent gave conflicting information about this purported cousin.

The termination petition was filed at the beginning of the third year of the child protective proceeding. By the time of the termination hearing, respondent was homeless and living with a friend. Testimony from the caseworkers and case aides indicated that respondent clearly loved the children but she struggled to manage all three children at the same time and would become overwhelmed when the children acted out. There was also concern about a lack of progress with respondent's treatment plan and the children's safety when in respondent's care.

The court-appointed special advocate (CASA) worker recommended termination, primarily because respondent had continued to allow contact between the children and McCloud and also because respondent patently could not provide a stable environment for the children. Respondent testified that after the 13-month-old child was burned in 2016, she concluded that McCloud had intentionally burned both him and her other child in 2013. She did not immediately voice that belief, however, because she had been afraid of McCloud, who had abused her in the past. Respondent explained that fear was also the reason she accepted his many phone calls from jail and prison. She claimed that she would never again become involved with a person who was controlling or allow a man to be with her children until she really knew him. But she admitted that she had accepted $20 from a man whom she had met and about whom the foster care worker had voiced concerns because he was in domestic violence counseling. Respondent pointed out that the man had been the victim of domestic violence and had given her the money because he understood her situation. Respondent claimed that she would keep the children safe by not letting them be around McCloud or other random men.

## II. GUIDING PRINCIPLES

If a trial court finds that a single statutory ground for termination has been established by clear and convincing evidence and that it has been proved by a preponderance of the evidence that termination of parental rights is in the best interests of a child, the court is mandated to terminate a respondent's parental rights to that child. MCL 712A.19b(3) and (5); MCR 3.977(H)(3); *In re Beck*, 488 Mich 6, 10-11; 793 NW2d 562 (2010); *In re Moss,* 301 Mich App 76, 90; 836 NW2d 182 (2013); *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). "This Court reviews for clear error the trial court's ruling that a statutory ground for termination has been established and its ruling that termination is in the children's best interests." *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011); see also MCR 3.977(K). "A finding . . . is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed[.]" *In re BZ*, 264 Mich App 286, 296; 690 NW2d 505 (2004). In applying the clear error standard in parental termination cases, "regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989); see also MCR 2.613(C).

## III. STATUTORY GROUNDS FOR TERMINATION

We first review the finding of whether there was sufficient evidence to terminate respondent's parental rights under MCL 712A.19b(3)(j), which provides for termination when clear and convincing evidence establishes that "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." The trial court terminated respondent's parental rights based on this statutory ground because of the risk of harm to the children resulting from respondent's lack of insight into who should be allowed around the children. In making this finding, the trial court noted the injuries McCloud inflicted on the children, but it did not rely solely on the risk he posed. Instead, the court found that the children were at a risk of harm because of respondent's lack of insight with respect to permitting others to be around the children in general.

The trial court did not clearly err in finding that § 19b(3)(j) had been established by clear and convincing evidence. Respondent's mental health had been identified as an issue, and the treatment plan provided for a psychological evaluation and any counseling recommended as the result of the evaluation. Respondent was provided help in identifying healthy relationships and, once domestic violence was found to be an issue, she was also provided domestic violence counseling. On numerous occasions, the court made clear that the goal of respondent's counseling was for respondent to benefit from the information on healthy and unhealthy relationships, to act in a manner that kept the children safe, and to set boundaries with other adults and the children. At one hearing, the trial court stated that it would evaluate whether respondent was "able to apply that information [on relationships] to her day-to-day life to set up those barriers so the children are safe." At another hearing, the trial court told respondent that it would be key for her to show that she could say "no" to people that were forceful and perhaps manipulative.

Throughout this lengthy case, respondent appeared to struggle with identifying healthy relationships and setting boundaries to protect the children. It is true that respondent seemed to recognize the hostile and demanding behavior of her grandmother's husband and also started to recognize McCloud's controlling conduct, admitting that she had been abused by him. But there was also evidence that respondent was unwilling to reveal the identities of people in her home and was allowing people to sleep there without knowing their names. It was also concerning that respondent had not informed her caseworker about a former boyfriend and appeared interested in a relationship with a man who gave her money but who also called her repeatedly and displayed signs of being controlling and demanding. Additionally, respondent did not attend counseling sessions during the six months prior to the termination hearing.

In sum, the evidence supported the trial court's conclusions that although respondent may have made some progress, she was not yet able to identify healthy relationships and establish boundaries to protect the children; consequently, there was a reasonable likelihood of harm to the children if returned to respondent's care. Accordingly, the trial court did not clearly err in terminating respondent's parental rights under MCL 712A.19b(3)(j). Because only one ground for termination need be established, MCL 712A.19b(3); MCR 3.977(H)(3), we find it unnecessary to review the trial court's decision to terminate respondent's parental rights under MCL 712A.19b(3)(c)(*i*).

## IV. ADMISSION OF REPORT CONTAINING NAME OF AN UNIDENTIFIED PERSON

Respondent next argues that her due-process rights were violated when the trial court admitted into evidence a report containing the name of a person who was not identified but about whom the trial court expressed concern. Respondent reasons that it was possible that the trial court's perception of respondent may have been altered by seeing the name of this unidentified person on the report. Respondent did not raise this issue at the trial level. "We review unpreserved claims of constitutional error under a plain-error analysis." *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. (quotation marks omitted). An error affects a party's substantial rights if it is prejudicial by impacting the outcome of the

proceedings. *Lawrence v Mich Unemployment Ins Agency*, 320 Mich App 422, 443; 906 NW2d 482 (2017).

There was no plain error in this case because the record reflected: that the trial court was focused on the management of the case when it referenced the unnamed person; that the prosecutor had also been concerned about the unnamed person and had therefore contacted the supervisor from the foster care agency; that the trial court reassured both the Department of Health and Human Services and the CASA worker that they were doing a good job; and that the trial court thought it may be necessary to explain something to the foster parents. This shows that rather than being unfair to respondent, the trial court was apparently trying to ensure that the case was properly managed. Furthermore, the court's statement that the foster care parents may need an explanation indicated that the potential problem likely involved the foster care placements rather than respondent. Thus, the record simply does not support respondent's claim that her due-process rights were violated.

Respondent also argues that the trial court's disregard for her due-process rights in relation to the unidentified person constituted grounds for disqualification of the court. A trial judge is presumed to be fair and impartial, and any litigant who challenges this presumption bears a heavy burden to prove otherwise. *In re Susser Estate*, 254 Mich App 232, 237; 657 NW2d 147 (2002). Respondent's argument has no merit. First, respondent failed to timely move for disqualification at the trial level pursuant to MCR 2.003(D)(1)(a). Second, the record does not support her claim that her rights were disregarded or that the trial court was biased against her. Instead, the trial court simply appeared to be trying to avoid potential problems in the management of her case. Third, her reliance on MCR 2.003(C)(1)(c) is misplaced because that subsection provides for the disqualification of a judge when the judge has personal knowledge of disputed evidentiary facts concerning the proceeding. The trial court's reference to a name on a report hardly constitutes personal knowledge of such facts. Thus, there was no plain error, let alone a plain error that affected respondent's substantial rights, when the trial court admitted into evidence the report containing the name of the unidentified person.

## V. BEST INTERESTS OF THE CHILDREN

With respect to a child's best interests, we place our focus on the child rather than the parent. *In re Moss*, 301 Mich App at 87. The interest of the child in living in a stable home is superior to any interest of the parent. *In re Medina*, 317 Mich App 219, 237; 894 NW2d 653 (2016). In assessing a child's best interests, a trial court may consider such factors as a "child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). A trial court can additionally consider the length of time a child "was in foster care or placed with relatives," and whether it was likely that "the child could be returned to [the parent's] home within the foreseeable future, if at all." *In re Frey*, 297 Mich App 242, 248-249; 824 NW2d 569 (2012).

In this case, the trial court did not clearly err when it found that termination of respondent's parental rights was in the children's best interests. There was evidence that respondent loved the children, that she took care of the children, and that respondent worked to improve her parenting skills. But we cannot overlook the fact that two of her children suffered burns inflicted by McCloud, yet she initially stood by McCloud and was deceptive about other men. Furthermore, there was evidence that the three children were thriving in the home of their foster care parents where they had lived for over a year by the time of the termination hearing and that the foster parents were willing to adopt the children, which would allow the children to stay with their siblings. In the opinion of the infant mental health specialist, given the oldest boy's attachment to the foster parents, it would have been traumatic for him to be moved from their care. Moreover, it appeared that the foster parents were committed to ensuring that the children have no contact with McCloud. This proceeding lasted for over 2½ years and, considering the children's need for permanency and stability, we conclude that the trial court did not clearly err in finding by a preponderance of the evidence that terminating respondent's parental rights was in the children's best interests.

We affirm.

/s/ Jane E. Markey
/s/ Elizabeth L. Gleicher
/s/ Michael J. Kelly